**[J-25-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 97 MAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Chester County Court of Common |
| | : | Pleas, Criminal Division, dated |
| v. | : | August 22, 2022 (filed on August 23, |
| | : | 2022) at No. CP-15-CR-1570-2016. |
| | : | |
| GEORGE J. TORSILIERI, | : | ARGUED: May 23, 2023 |
| | : | |
| Appellee | : | |

**OPINION**

**CHIEF JUSTICE TODD**                                   **DECIDED: May 31, 2024**

In this direct appeal following a remand, we consider whether the General Assembly's determination, in Pennsylvania's Sexual Offender Registration and Notification Act ("SORNA")[1], that individuals who commit sexual offenses pose a high risk of committing additional sexual offenses constitutes an unconstitutional irrebuttable presumption violative of due process, because it impairs the right to reputation under the Pennsylvania Constitution.[2]  In addition, we are asked to determine whether the registration and notification requirements in Subchapter H of SORNA constitute criminal punishment, which serves as the predicate for various constitutional challenges to the

---

[1] 42 Pa.C.S. §§ 9799.10 – 9799.42.

[2] Pa. Const. art. 1, § 1.

legislation. For the reasons that follow, we conclude that SORNA withstands these challenges, and, thus, reverse the order of the Chester County Court of Common Pleas.

## I. Background

By way of brief background, to contextualize the factual and procedural history of this appeal as well as the parties' arguments, the first issue before us concerns a presumption which largely undergirds the criminal justice system's treatment of sex offenders: that those who commit sexual offenses pose a high risk to reoffend. The General Assembly has memorialized this presumption in its legislative findings: "Sexual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." 42 Pa.C.S. § 9799.11(a)(4). To challenge such assumptions under the irrebuttable presumption doctrine, a challenging party must demonstrate: (1) an interest protected by the due process clause; (2) utilization of a presumption that is not universally true; and (3) the existence of a reasonable alternative means to ascertain the presumed fact. *In re J.B.*, 107 A.3d 1, 15-16 (Pa. 2014). In *In re J.B.*, our Court considered the irrebuttable presumption that juvenile offenders pose a high risk of committing additional sexual offenses; we found such presumption denied juveniles due process because it impaired their right to reputation protected by Article I, Section 1 of the Pennsylvania Constitution. We now address this same issue with respect to adult sexual offenders.

The second issue we will consider involves whether Subchapter H constitutes criminal punishment. Whether a statute is punitive in nature is a threshold question for determining the viability of the various constitutional challenges brought in this matter, including whether the legislation unconstitutionally usurps judicial power over sentencing

in violation of the separation of powers doctrine,[3] violates the United States Constitution's prohibition on cruel and unusual punishment,[4] and infringes upon the right to a trial by jury by failing to require that facts that increase the punishment imposed on the underlying crime be found by a reasonable doubt.[5]  It is a gateway inquiry, as legislation must be deemed to be in the nature of criminal punishment to invoke the protections of these constitutional provisions.  Our Court has considered the punitive nature of various Pennsylvania sex offender statutes, including Megan's Law and its progeny.  *See Commonwealth v. Gaffney*, 733 A.2d 616 (Pa. 1999) (concluding the notification requirements of Megan's Law I were not punitive, and, therefore, did not violate *ex post facto* protections); *Commonwealth v. Williams*, 733 A.2d 593 (Pa. 1999) ("*Williams I*") (striking Megan's Law I sexually violent predator provisions as imposing criminal punishment and violating due process guarantees); *Commonwealth v. Williams*, 832 A.2d 962 (Pa. 2003) ("*Williams II*") (upholding Megan's Law II's provisions as not constituting criminal punishment); *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017) (plurality) (finding SORNA's provisions to be punitive, and retroactive application to violate federal *ex post facto* protections); *Commonwealth v. LaCombe*, 234 A.3d 602 (Pa. 2020) (holding retroactive application of Subchapter I of SORNA was not punitive or an unconstitutional *ex post facto* violation).  We now address this same issue with respect to Subchapter H of SORNA.

## II.    Facts

---

[3] Pa. Const. art. II, § 1; *id*. art. IV, § 2; *id*. art. V, § 1; *see also Renner v. Court of Common Pleas of Lehigh County*, 234 A.3d 411, 419 (Pa. 2020).

[4] U.S. Const. amend. 8.

[5] U.S. Const. amend. 6; *Alleyne v. United States*, 570 U.S. 99 (2013); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

With this context in hand, we turn to the facts and procedural history underlying this appeal. In 2017, after a six-day trial, a jury convicted Appellee, George Torsilieri, of one count each of aggravated indecent assault, 18 Pa.C.S. § 3125(a)(1), and indecent assault, *id*. § 3126(a)(1), for an attack on a woman in the early morning hours of November 14, 2015. The jury, however, acquitted him of sexual assault, *id*. § 3124.1.

Prior to sentencing, the Sex Offenders Assessment Board ("SOAB") conducted an evaluation and determined Appellee did not meet the criteria to be designated as a sexually violent predator. On November 27, 2017, Judge Anthony A. Scarcione of the Chester County Court of Common Pleas sentenced Appellee to a term of incarceration of 1 to 2 years imprisonment (minus one day on each end), followed by three years of probation.

As a result of his conviction for aggravated indecent assault, Appellee was automatically categorized under Subchapter H of SORNA as a Tier III sexual offender. This designation subjected him to lifetime registration and notification regarding a panoply of changes in his personal life, which we will discuss more fully below, including his address, employment status, and significant change in physical appearance, with the Pennsylvania State Police ("PSP"). 42 Pa.C.S. § 9799.14(d)(7); *id.* § 9799.16(c)(4).

On February 21, 2018, the General Assembly enacted Act 10 of 2018, which amended SORNA to address the constitutional shortcomings found by our Court in *Muniz*, *supra*. In doing so, the legislature divided the registration statute into two chapters. Subchapter H, at issue in this appeal, was applied to sexual offenders who committed their offenses on or after December 20, 2012, and, thus, to whom *Muniz*'s prohibition against retroactive application of SORNA did not apply. *See* 42 Pa.C.S. §§ 9799.10-9799.42. Subchapter I, an entirely new subchapter, was applied to sexual offenders who committed their offenses prior to December 20, 2012, and whose registration obligations

were potentially affected by *Muniz*. *See id*. §§ 9799.51-9799.75. As his assault took place in 2015, and, thus, after December 20, 2012, Appellee was subjected to the requirements of Subchapter H, and so our Court's decision in *Muniz*, rendered two weeks after Appellee's conviction, did not impact him.

Seemingly addressing assertions that the prior registration and notification requirements were punitive, the General Assembly modified some of SORNA's provisions, creating a procedure by which a Tier II or III offender's in-person semi-annual or quarterly registrations could be reduced after three years and replaced with annual in-person and semi-annual or quarterly telephone registrations, if the offender complied with all registration requirements for the first three years and had not been convicted of another offense punishable by more than a year of incarceration. *Id*. § 9799.25(a.1). It additionally limited the non-sexual offenses triggering SORNA registration and provided a process for sexual offenders to petition for removal from the registry after 25 years, if they have not been convicted of an offense punishable by more than a year of incarceration, and if they prove by "clear and convincing evidence that exempting the sexual offender . . . is not likely to pose a threat to the safety of any other person." *Id*. § 9799.15(a.2)(5).

Relevant to this matter, on May 18, 2018, Appellee filed a post-sentence motion in which he alleged that the registration and notification provisions of Subchapter H violated his due process rights under the Pennsylvania Constitution, including the contention that the legislative underpinnings of Subchapter H were empirically false. In support thereof, he cited and attached reports and sworn affidavits from experts who had performed studies on the recidivism potential of sex offenders, certain of which are summarized below, which he claimed supported the conclusion that the application of these registration and notification provisions was unconstitutional. According to Appellee, the

registration and notification provisions rested on SORNA's stated presumption that sexual offenders are, as a class of individuals, dangerous and pose a high risk of recidivism, justifying the registration and notification provisions so as to protect the public. Additionally, Appellee asserted that the statute was punitive, and unconstitutional, as it was violative of the separation of powers doctrine, constituted a criminal sentence in excess of statutory maximums which was not found beyond a reasonable doubt, and was inconsistent with the prohibition on cruel and unusual punishment. The Commonwealth opposed the motion.[6]

On August 30, 2018, Judge Scarcione, based on the empirical evidence Appellee provided, declared Subchapter H unconstitutional as violative of Appellee's substantive due process rights by, *inter alia*, infringing on his right to reputation through an improper use of an irrebuttable presumption. The trial court also determined that the registration and notification provisions constituted punishment, and, thus, violated the separation of powers doctrine by removing the trial court's ability to fashion an individualized sentence. Additionally, the court found that Subchapter H violated the requirements of *Alleyne* and *Apprendi*, as the registration and notification requirements constituted an enhanced criminal punishment based upon a factual finding which was not made by the factfinder beyond a reasonable doubt. Finally, the court concluded that Subchapter H violated the federal and state proscriptions against cruel and unusual punishment. Thus, the trial

---

[6] While this motion was pending in the trial court, the General Assembly enacted and the Governor signed an amended version of SORNA through Act 29 of 2018, Act of June 12, 2018, P.L. 140, No. 29, effective on June 12, 2018 ("Act 29"). The parties do not suggest that the Act 29 amendments alter the provisions of Subchapter H relevant to the issues before us.

court vacated Appellee's registration requirements.  The Commonwealth appealed to our Court.[7]

### III. *Torsilieri I*

In a divided decision, a majority of our Court vacated the portion of the trial court's order declaring the registration and notification requirements of Subchapter H unconstitutional, and remanded for further proceedings.  *Commonwealth v. Torsilieri*, 232 A.3d 567 (Pa. 2020) ("*Torsilieri I*").  Specifically, after surveying the history of sexual offender registration in Pennsylvania, we noted that we have refused to "pigeonhole" the irrebuttable presumption doctrine into either procedural or substantive due process categories, and, rather, have addressed such challenges "simply as an irrebuttable presumption challenge."  *Id*. at 581.  In addressing Appellee's challenge, we recognized the significant deference to be accorded to legislative determinations, but noted such deference is not without limits, and we refused to accept the Commonwealth's argument that this was, fundamentally, a question of policy to which we were categorically mandated to defer to the General Assembly's judgment.  *Id*. at 583-84.  We observed that "a viable challenge to legislative findings and related policy determinations can be established by demonstrating a consensus of scientific evidence where the underlying legislative policy infringes constitutional rights.  In such cases, it is the responsibility of the court system to protect the rights of the public."  *Id*. at 584.  Distinguishing *In re J.B.*, we noted that, unlike in that case, "the evidence of record does not demonstrate a consensus of scientific evidence as was present [in *In re J.B.*] to find a presumption not universally true . . .  nor the 'clearest proof' needed to overturn the General Assembly's

---

[7] *See* 42 Pa.C.S. § 722(7) (providing for exclusive jurisdiction in the Pennsylvania Supreme Court over final orders in which the court of common pleas declares a statute unconstitutional).

statements that the provisions are not punitive, which we have noted 'requires more than merely showing disagreement among relevant authorities.'" *Id.* at 594.

However, while we found Appellee's evidence raised a "colorable argument to debunk the settled view of sexual offender recidivation rates and the effectiveness of tier-based sexual offender registration systems underlying the General Assembly's findings as well as various decisions of this Court and the United States Supreme Court," *id*. at 596, we noted the lack of opposing science in the record, as well as the fact that the record did not, at that time, provide a sufficient basis to overturn the legislative presumption. *Id*. Hence, we remanded the matter to the trial court for further evidentiary proceedings.

As a predicate to Appellant's other constitutional challenges, we also directed the trial court on remand to consider whether the registration and notification requirements applicable to sexual offenders constituted criminal punishment, and in doing so, to address five of the seven factors,[8] discussed more fully below, as set forth by the United States Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), to determine the punitive nature of legislation: (1) whether the requirements involve an affirmative disability or restraint; (2) whether they have been historically regarded as punishment; (3) whether their operation will promote the traditional aims of punishment— retribution and deterrence; (4) whether they may be rationally connected to an alternate purpose; and (5) whether they are excessive in relation to the alternative purpose.

Justice Donohue dissented. She believed that the evidence contained in the record was sufficient to decide the matter and would have found that due process

---

[8] The Court found, consistent with prior case law, that *Mendoza-Martinez* factor 3, a finding of scienter, and factor 5, past criminal misconduct, provide little guidance in determining whether Subchapter H is punitive, and, thus, did not discuss or remand for further analysis of these factors. *Torsilieri I*, 232 A.3d at 589.

precluded the General Assembly from presuming that all persons convicted of one of the enumerated crimes posed a high risk of committing additional sexual offenses. Thus, Justice Donohue would have held that SORNA's revisions created an unconstitutional irrebuttable presumption. Finally, Justice Donohue noted that, as SORNA already required individualized assessment to determine whether an offender was a sexually violent predator, the existing procedure demonstrated that a reasonable alternative existed to ascertain an individual's specific risk of reoffending. Justice Mundy also dissented, joined by former Chief Justice Saylor, and would have found that Appellee failed to establish that the legislative underpinnings of Subchapter H were unconstitutional, emphasizing the deference to be given the legislature's findings as the policymaking branch of government.

## IV. Trial Court's Remand Determination

Upon return to the Chester County Court of Common Pleas, the matter was assigned to Judge Allison Bell Royer due to Judge Scarcione's retirement. The court conducted three days of evidentiary hearings and heard testimony from three experts for Appellee: Dr. Karl Hanson, a Canadian psychologist and adjunct research professor in the Psychology Department of Carleton University, Ottawa, Canada, President of the Society for the Advancement for Actuarial Risk Need Assessment, and a preeminent expert on sex offender recidivism and risk assessments; Dr. Elizabeth Letourneau, the Director of the Moore Center for Prevention of Child Abuse at Johns Hopkins; and James Prescott, J.D., Ph.D., a law professor who has published numerous law review articles on the efficacy of SORNA's registration and notification provisions on recidivism. In response, the Commonwealth presented the testimony of Dr. Richard McCleary, a statistician and professor at the University of California in Irvine.

The trial court applied the three-prong test described in *In re J.B., supra*, to determine the constitutionality of an irrebuttable presumption. First, the court determined that the irrebuttable presumption concerning sex offenders' heightened future dangerousness encroached upon a person's right to reputation under Article I, Section I of the Pennsylvania Constitution, and, thus, implicated a fundamental interest protected by the due process clause, satisfying the first prong. Specifically, the court found that the presumption stigmatizes individuals convicted of committing sexual offenses, resulting in difficulty in finding housing, employment, and establishing social relationships with others. Noting that other criminal offenders are not placed on a registry, the court opined that the stigma associated with the registry requirement is evident in the legislative finding that everyone convicted of a sex offense poses a high risk of reoffending.

Next, the court considered whether Appellee had established that the irrebuttable presumption created by Section 9799.11(a)(4) — that sexual offenders pose a high risk of committing additional sexual offenses — was not universally true. The court noted that Dr. Hanson related research showing that 80-85% of sex offenders do not reoffend sexually, and Dr. Letourneau, based on her review of published studies, estimated that figure to be 80-95%. Both Dr. Letourneau and Dr. Prescott also cited studies done in New York which showed that 95% of all sexual offenses are committed by first time offenders. The court observed that the Commonwealth's expert, Dr. McCleary, in response, first attacked the methodology of the research showing these low rates of reoffense, and he opined that, because of these methodological flaws, they were unreliable. Specifically, Dr. McCleary testified that results of comparison studies in this area did not yield data which led to easy comparisons, given the differences in registration laws by jurisdiction, the length of the follow-up period, how the results are validated, and

the heterogenicity of the samples used. In the court's view, this blanket denunciation of the studies offered by Appellee detracted from Dr. McCleary's credibility.

The trial court recounted that Dr. McCleary also testified as to the so-called "dark figure" of sexual offenses: the phenomenon that more sex offenses occur than are reported. In his view, this underreporting renders the alleged low recidivism rate cited by Appellee's experts unreliable because it does not account for these unreported crimes. Dr. McCleary found support for quantifying the exact degree of underreporting from a report by researchers Nicholas Scurich and Richard St. John called "The Dark Figure of Sexual Recidivism," which is a statistical model they developed to estimate the degree of underreporting ("Dark Figure model"). The Dark Figure model proceeds from an assumption that recidivism rates are a static quantity that does not change over time, and that most sex offenders, who reoffend, do so occasionally, every 5-10 years. These so called "low-rate offenders" alter their offending behavior to escape detection. Dr. Hanson attacked the reliability of this purely mathematical model because he noted that its assumptions are not supported by hard data which, in fact, shows that recidivism rates for individuals do change over time, but in a downwards direction, and that they are not notably higher than other offenders with a criminal record. Moreover, the court embraced the view that the exact number of "low-rate offenders" is unknown.

Ultimately, the trial court credited the testimony of Appellee's experts and specifically rejected the Dark Figure model. The court accepted Appellee's experts' conclusion that 80%-95% of all sex offenders will not reoffend, and, thus, concluded that SORNA's irrebuttable presumption was not universally true.

Finally, as to the last prong of the irrebuttable presumption test, the trial court considered whether reasonable alternatives exist to the current registration and notification provisions to protect the public. In this regard, the court pointed out that

Appellee's experts had identified several efficacious risk assessment tools which have been developed in the last 20 years to identify those with a high likelihood of reoffense. Moreover, the court found persuasive the fact that Appellee's experts had provided evidence from published studies that demonstrated that there were more effective treatment methods available, such as specialized treatment programs and coordinated multidisciplinary support services, which have proven effective in reducing recidivism and the public harm by convicted sex offenders. The trial court noted that our Court found in *In re J.B.* that the existence of individualized risk assessment was an appropriate alternative to SORNA's lifetime registration and notification requirements for juveniles, and observed also that Appellee's experts had furnished evidence that applying the blanket label of "dangerous sex offender recidivist" to all sex offenders diverted resources away from treatment and supervision of that small subset of offenders that pose the greatest risk of harm to society.

Accordingly, the trial court concluded that SORNA's irrebuttable presumption unconstitutionally impacted an individual's right to reputation under Article I, § 1 of the Pennsylvania Constitution. Because the lifetime registration and notification provisions were, in the court's view, directly premised on this unconstitutional assumption, it found those provisions unconstitutional as well.

The trial court went on to consider the five *Mendoza-Martinez* factors in determining whether Subchapter H or SORNA was punitive, which we discuss in detail below. In short, the court concluded that all five factors weighed in favor of finding the statute to be punitive, and, as a result, determined that the statute violated the separation of powers doctrine, the prohibition on cruel and unusual punishment, and the right to a jury determination of facts leading to the imposition of Subchapter H's registration and

notification provisions. Thus, for these reasons, the trial court struck Subchapter H as unconstitutional. The Commonwealth again appealed directly to our Court.

## V. Issue I

The first issue before us is whether the trial court erred by determining that the presumption contained in Section 9799.11(4) of SORNA — that individuals convicted of sexual offenses pose a high risk of committing additional sexual offenses — was an unconstitutional irrebuttable presumption.

Generally, the constitutionality of legislation is a pure question of law for which the scope of review is plenary, and the standard of review is *de novo*. *LaCombe*, 234 A.3d at 608. Here, however, we remanded the matter for additional evidence regarding whether there was a consensus as to the continued validity of the statutory presumption that sex offenders pose a high risk for reoffending. Thus, because the inquiry contains a factual component, this somewhat unique constitutional inquiry constitutes a mixed question of fact and law, with emphasis on the ultimate legal conclusion of whether the irrebuttable presumption is unconstitutional. *See generally Commonwealth v. Crawley*, 924 A.2d 612, 615 (Pa. 2007) ("The standard for reviewing mixed questions of law and fact is not settled in Pennsylvania and the question presented is what level of deference the determination by the PCRA court should be given. . . . The answer to this question must be evaluated on an issue-by-issue basis, since some mixed questions are more heavily weighted toward fact, while others are more heavily weighted towards law."); *see also Warehime v. Warehime,* 761 A.2d 1138, 1146 n.4 (Pa. 2000) (Saylor, J., concurring) ("[M]ixed questions differ in terms of the degree to which the legal versus the factual aspects predominate."); *see generally Commonwealth v. Santiago,* 654 A.2d 1062, 1072 (Pa. Super. 1994) (describing federal courts' approach to review of mixed questions, which varies according to the predominance of legal over factual aspects).

Furthermore, legislation carries with it a strong presumption of constitutionality, which will not be overcome unless the legislation is "clearly, palpably and plainly" in violation of the Constitution. *Commonwealth v. McMullen*, 961 A.2d 842, 846 (Pa. 2008). Indeed, a party challenging legislation as unconstitutional bears a heavy burden, and all doubts are to be concluded in favor of a finding of constitutionality. *Commonwealth v. Mayfield*, 832 A.2d 418, 421 (Pa. 2003).

## A. Parties' Arguments

The Commonwealth asserts that Appellee's heavy burden on remand to the trial court was clear: to demonstrate that a scientific consensus has developed to refute SORNA's presumption that convicted sex offenders pose a higher risk of committing additional sex crimes after release than non-sex offenders. The Commonwealth submits that Appellee failed to meet that burden, by presenting only a counter-narrative to the evidence that the General Assembly relied upon in formulating the statute — that is, the Commonwealth insists that Appellee offered merely a "battle of experts." Commonwealth's Brief at 24. Furthermore, the Commonwealth maintains that the trial court, rather than finding that Appellee's experts had demonstrated a scientific consensus, concluded merely that Appellee's evidence was more persuasive and demonstrated that sex offenders do not reoffend very often, and that there were reasonable and more effective alternatives to the statutory tier-based registration. The Commonwealth emphasizes that what constitutes a low or high rate of recidivism is ultimately a value judgment regarding the degree of sexual reoffending society wishes to tolerate, and, as such, a matter of public policy which is reserved for the legislature. The Commonwealth contends that, not only did the trial court's ruling exceed the scope of our Court's mandate on remand, but that Appellee's evidence showed that convicted sex offenders commit new sex crimes at a rate *three to four times higher* than those who are

convicted of non-sexual offenses who then commit future sex crimes, a fact on which the Commonwealth contends all three of Appellee's experts agreed.

In support of its position, the Commonwealth highlights that Justice Donohue recognized in her *Torsilieri I* dissent that the operative inquiry was whether sex offenders commit new sex crimes at a higher rate than those who commit non-sexual offenses and then commit a second offense that is a sex crime, thereby justifying the legislature's differential treatment. 232 A.3d at 606 (Donohue, J., dissenting). Indeed, the Commonwealth offers that this was the same approach taken by our Court in *In re J.B.*, 107 A.3d at 17 (finding a scientific consensus had been established that juveniles convicted of sexual crimes commit new sexual crimes at a rate "indistinguishable" from juvenile non-sexual offenders). In contrast, the Commonwealth underscores that Appellee, by his own evidence, established that adult sexual offenders reoffend at a rate of three to four times higher than individuals convicted of non-sexual offenses, thus, validating the policy underpinnings of Subchapter H.

Further, even assuming "low" recidivism rates were relevant, the Commonwealth stresses that it was Appellee's burden to show, by the clearest proof, a scientific consensus that recidivism rates were low, which he was unable to do. This is because, as the Commonwealth notes, the trial court's estimate does not, by Appellees' experts' own admissions, fully account for the "dark figure" – the amount of unreported sex offenses – which they admit is unknowable; hence, the Commonwealth contends the actual rate of new sex crimes committed by those previously convicted of sexual offenses is in all likelihood even higher than the three-to-four-times-higher figure Appellee's experts estimated. According to the Commonwealth, the General Assembly was entitled to make reasonable assumptions that, because of shame and revictimization, sex crimes are significantly underreported, and at rates significantly greater than those of other violent

offenses such as murder and armed robbery. Thus, the Commonwealth concludes Appellee did not meet his burden of demonstrating a scientific consensus exists to overturn the legislative policy determinations that give rise to the irrebuttable presumption.

The Commonwealth further asserts that Appellee failed to establish a scientific consensus that shows that the public protection purpose of the registration and notification requirements is not being fulfilled. The Commonwealth stresses that deterrence of sex offenders was not the primary purpose of these requirements, but, rather, that they were intended to give the public sufficient information so that they could avoid unsafe interactions with convicted sex offenders, and, thus, reduce the risk of becoming victims of such offenders.

Instead of demonstrating a scientific consensus that the registration and notification provisions failed that purpose, the Commonwealth contends that Appellee's experts focused on only the efficacy of the registration and notification provisions as a deterrent for *sex offenders* which, in its view, was not the legislative purpose of SORNA. As evidence of this legislative purpose of public awareness, the Commonwealth cites to 42 Pa.C.S. § 9799.11(a)(3), (7), and (8), in which the legislature declares that the information furnished to the community through registration and notification was necessary so that community members could take precautionary measures.[9] Thus,

---

[9] See 42 Pa.C.S. § 9799.11, which provides in relevant part:

> **(a)    Legislative findings.--**The General Assembly finds as follows:
>
> * * *
>
> (3) If the public is provided adequate notice and information about sexual offenders, the community can develop constructive plans to prepare for the presence of sexual offenders in the community. This allows communities to meet with law enforcement to prepare and obtain information about

(continued…)

according to the Commonwealth, the trial court and Appellee failed to distinguish between the concepts of deterrence and avoidance – the latter being the main purpose of SORNA. Indeed, the Commonwealth stresses that the goal of recidivism reduction is nowhere in the statute and that there are other laws which speak to deterrence through the imposition of imprisonment and fines. The Commonwealth asserts that the trial court improperly disregarded this purpose and focused instead on the effects the registration and notification requirements had on recidivism. Moreover, the Commonwealth avers that Appellee presented no research or evidence, much less proof of a scientific consensus, that the registry failed to offer concerned citizens information they could use to avoid sexual offenders.

Finally, the Commonwealth argues that the trial court misunderstood its role when it offered its views on "reasonable alternatives" to registration. As emphasized by the Commonwealth, the factual determinations made by the trial court were not part of a public policy debate, and evaluations of reasonable alternatives in solving societal problems are for the General Assembly.[10]

_____

the rights and responsibilities of the community and to provide education and counseling to residents, particularly children.

* * *

(7) Knowledge of whether a person is a sexual offender could be a significant factor in protecting oneself and one's family members, or those in care of a group or community organization, from recidivist acts by such offenders.

(8) The technology afforded by the Internet and other modern electronic communication methods makes this information readily accessible to parents, minors and private entities, enabling them to undertake appropriate remedial precautions to prevent or avoid placing potential victims at risk.

[10] The Pennsylvania Coalition Against Rape, as *amicus*, stresses the importance of the registry, asserting it provides a layer of safety and protection for survivors and for (continued…)

In response, Appellee initially highlights the evidence presented at the hearing to argue that comparisons of the average recidivism rate is not the operative consideration in determining whether the irrebuttable presumption is universally true. Importantly, Appellee does not dispute that registrants are three times more likely to commit future sexual offenses compared to non-sex offenders, Appellee's Brief at 13, a statistic cited by the Commonwealth. However, Appellee contends that this statistic is not only deceiving but is not relevant, as it speaks to sexual offenders as a whole. *Id*. According to Appellee, the recidivism rate of most of the individuals on the registry is no greater than the rate for non-sex offenders. Stated another way, Appellee emphasizes that not all of those convicted of a sex crime are "equally likely to reoffend." *Id*. at 12. Rather, while every person convicted of a crime poses some risk of committing a future sexual crime, Appellee stresses that "individuals with a history of sexual crime who remain free of arrests for a sex offense will eventually become less likely to reoffend than a non-sexual

community members who care about the safety of others, including children, by warning the public about sexual offenders so that they can act to protect themselves. In doing so, *amicus* emphasizes that recidivism rates do not reflect the vast number of unreported acts of sexual violence and assault, or those reported and not prosecuted. *Amicus* Pennsylvania District Attorneys Association proffers that value judgments are within the purview of the legislature, and that courts should not substitute their policy judgments for those of the General Assembly. *Amicus* Office of the Victim Advocate adds that deference is to be accorded to the legislature's policy judgments, and so our Court must respect SORNA's provision of relevant, timely, and current information to victims about their attackers so that informed decisions can be made regarding their personal safety. Finally, *amicus* PSP warns that affirmance of the trial court's decision would likely result in the removal of 9,649 sexual offenders from the registry, and endorses the Commonwealth's position that Appellee failed to demonstrate a universal consensus that the irrebuttable presumption undergirding SORNA — that those adults convicted of a sexual offense are more likely to commit another sexual offense than those adults convicted of non-sexual offenses — is false. PSP adds that, as a practical matter, striking Subchapter H as unconstitutional would not only result in the removal of over 9,000 sexual offenders from the registry, but would, in turn, result in offenders from another state not being required to register, even if that state notifies the PSP, encouraging sexual offenders to move to Pennsylvania.

offender is to commit an 'out of the blue' sexual offense," what Dr. Hanson termed "the 'desistance' point." *Id.* at 15. More specifically, Appellee posits that, when comparing individuals who have been convicted of a sex crime with non-sexual offenders, the time to desistance varies, but that most individuals cross that point 10-15 years after release from incarceration. *Id*.

Appellee, while acknowledging that his proffered relatively low rates of reoffending do not reflect the absolute rate of sexual offending, as not all post-conviction sexual offending is reported or detected, he dismisses a "dark figure" of sexual offending as irrelevant when comparing those who are registered and those who are not, claiming that undetected rates are equivalent for individuals with or without a sexual offense history. Regardless, Appellee contends that the recidivism rate, even adjusted for the underreporting of sexual offending, is likely not significantly higher than the reported rate.

Appellee continues by observing that the trial court found that there was no relationship between registration and sexual recidivism, with a few minor exceptions, and Dr. Letourneau echoed the sentiment that registration is an ineffective strategy to prevent subsequent sex crimes. Appellee maintains that there is no "counter-narrative" to his expert's view that SORNA does not prevent recidivism. Indeed, Appellee proffers that SORNA's anti-re-entry policies render it impossible for a sex offender to return to normal life, which in turn *increases* the recidivism risk of such individuals. *Id*. at 31-33. In contrast, Appellee insists that there are more effective means by which to manage the risk of sexual reoffense, such as classifying individuals according to risk, private registration, and the early termination of registration.

Appellee then turns to what he deems to be an independent argument regarding the constitutionality of Subchapter H, separate from his irrebuttable presumption claim. Specifically, Appellee asserts that the Pennsylvania Constitution protects the right of

reputation as a fundamental right pursuant to Article I, Section 1, and that registration as a sex offender stigmatizes persons committing sexual offenses, threatening their reputations. Accordingly, Appellee maintains that strict scrutiny applies in analyzing whether Subchapter H violates one's right to reputation. In that regard, Appellee argues that Subchapter H is not narrowly tailored to meet its ends, and in support thereof, claims that the purpose of Subchapter H is to reduce sexual reoffending, rejecting the Commonwealth's assertion that its purpose is to provide citizens with information so as to avoid the dangers posed by sexual offenders reoffending. Accordingly, if the reduction of recidivist offending is the purpose, Appellee submits the means are not narrowly tailored. In that regard, Appellee insists that it is the Commonwealth's burden to establish that there are no less restrictive means available to accomplish the same ends. Appellee points out that the General Assembly could have, *inter alia*, drawn more narrow classes, eschewed a conviction-based system, or engaged in individual assessments.

Appellee then pivots back to his irrebuttable presumption challenge, by reiterating that, to satisfy the test for an unconstitutional irrebuttable presumption, an individual must establish three factors: (1) the existence of a presumption that impacts an interest protected by the due process clause; (2) a presumption that is not universally true; and (3) the existence of reasonable alternatives to ascertain the presumed fact. *Torsilieri I*, 232 A.3d at 586. Contending that there is no dispute regarding the first factor, Appellee turns to whether the presumption is universally true, and offers that, in this determination, one must examine whether "many or most people within the identified group lack the substantive characteristic." Appellee's Brief at 69 (quoting *Torsilieri I*, 232 A.3d at 604 (Donohue, J., dissenting)). Appellee points to cases where universal presumptions have been stricken — such as laws removing children from the custody of unwed fathers because of the irrebuttable presumption that all unwed fathers were bad parents, *see*

*Stanley v. Illinois*, 405 U.S. 645 (1972), or barring individuals from driving for a year if they have one epileptic seizure, *see Bureau of Drivers' Licensing v. Clayton*, 684 A.2d 1060 (Pa. 1996). He asserts that, in those cases, no one questioned the proposition that the percentage of unwed fathers who were bad parents was likely to be higher than other parents, or the percentage of those who had one epileptic seizure having another accident caused by a seizure were likely to be higher than that of drivers who did not have a prior seizure, as those were not the dispositive inquiries. Rather, Appellee claims the inquiry in such cases focused on whether each group member uniformly reflected the presumption, and the courts in those cases concluded that the presumption was not true because many members of both groups were unlikely to exhibit these behaviors; thus, the courts invalidated the presumption.

Hence, in Appellee's view, his evidence showing that "most" people on the sex offender registry in Pennsylvania are no more likely to sexually reoffend than those with non-sexual criminal records demonstrates that the presumption is false as to most sex offenders who are required to register, even when one accounts for any underreporting of sexual crimes. That is, the presumption is not, in his view, universally true for all members of the group of sex offenders required to register.

Appellee further maintains that his evidence established that reasonable alternative means exist to better identify and manage offender risk, such as the predictive assessments recommended by his experts, or evaluation by the SOAB as is done for sexually violent predators. Finally, Appellee contends that there is no meaningful opportunity to challenge the presumption of dangerousness.[11]

_____

[11] *Amici* Assessment and Treatment Alternatives and the Joseph J. Peters Institute, consistent with Appellee's position, argue that SORNA's registration requirements do not further the statute's purpose of preventing offender recidivism. *Amici* claim that the likelihood of offenders recidivating is low and substantially decreases over time. Additionally, *amici* assert that the notification and registration requirements, which place (continued…)

## B. Analysis

This issue challenges the constitutionality of Subchapter H of SORNA on the basis that it relies on an unfounded irrebuttable presumption that sex offenders pose a high risk of committing additional sexual offenses. In addressing constitutional challenges to legislative enactments, we are ever cognizant that "the General Assembly may enact laws which impinge on constitutional rights to protect the health, safety, and welfare of society," but also that "any restriction is subject to judicial review to protect the constitutional rights of all citizens." *In re J.B.*, 107 A.3d at 14.

Initially, we note that this is a somewhat unique constitutional challenge. Appellee's irrebuttable presumption argument contests the underpinnings on which the legislature based its enactment. In essence, Appellee claims that the General Assembly's policy choices violate our organic charter. To successfully bring such a constitutional challenge is a tall order, and rightfully so, as generally "policy-based arguments are for the policy-making branches. They are not for the judiciary." *Keystone RX LLC v. Bureau of Workers' Compensation Fee Review Hearing Office*, 265 A.3d 322, 334 (Pa. 2021) (Wecht, J., concurring). Sharpening the point, courts must be mindful that "the wisdom of a public policy is one for the legislature, and the General Assembly's enactments are

---

offenders at risk for unemployment, homelessness, physical and verbal harassment, and property damage, paradoxically, actually increase the risk of recidivism and inhibit sex offenders' successful reintegration and rehabilitation, diluting the purpose and power of the registry.

Additionally, *Amici* Sixteen Legal Scholars focus on research which, like that presented by Appellee's experts, shows that most individuals convicted of sexual offenses are not likely to commit additional sexual offenses, particularly as time passes. They rely on evidence that shows that, after ten years, the rates of new sexual offenses committed by those who are convicted of sex crimes is approximately the same as those who have committed non-sexual offenses. *Amici* also stress that research demonstrates that evaluation tools and individualized treatment plans are a superior means of protecting the public from victimization by sex offenders than registration and notification requirements.

entitled to a strong presumption of constitutionality rebuttable only by a demonstration that they clearly, plainly, and palpably violate constitutional requirements." *Shoul v. Department of Transportation*, 173 A.3d 669, 678 (Pa. 2017); *see also Torsilieri I*, 232 A.3d at 596. Stated another way, "the power of judicial review must not be used as a means by which the courts might substitute [their] judgment as to the public policy for that of the legislature." *Parker v. Children's Hospital of Philadelphia*, 394 A.2d 932, 937 (Pa. 1978). Because of this, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. 93, 111 (1979). Indeed, "it will be the rare situation where a court will reevaluate a legislative policy determination, and doing so can only be justified in a case involving the infringement of constitutional rights and a consensus of scientific evidence undermining the legislative determination." *Torsilieri I*, 232 A.3d at 596.

With this overview of the relevant standards and presumptions firmly in hand, we turn to a threshold matter. As part of his challenge to Subchapter H, Appellee first raises what he claims to be an argument "independent" of the irrebuttable presumption doctrine regarding the constitutionality of Subchapter H. In sum, Appellee contends that, as Subchapter H impacts one's right to reputation, a strict scrutiny analysis applies, and, under that construct, the statute is not narrowly tailored to support its ends. While not labeling it so, Appellee's argument is akin to a substantive due process challenge.

However, Appellee's broadside challenge to SORNA is inextricably intertwined with the similar claim of harm to reputation caused by SORNA's allegedly erroneous presumption that sexual offenders pose a high risk of reoffense. For example, Appellee offers that SORNA sends the express message that all registrants pose a high risk of committing additional sexual offenses, citing 42 Pa.C.S. § 9799.11(a)(4), and asserts that,

even without this statutory declaration, "the common view of registered sexual offenders is that they are particularly dangerous and more likely to reoffend than other criminals." Appellee's Brief at 52 (citation omitted). Indeed, Appellee submits that Subchapter H "broadcasts a presumed and usually false propensity" about sexual offenders, which he believes breaches his right to reputation. *Id*. at 53.

A similar substantive due process argument was raised in *In re J.B.*, wherein the appellees argued that SORNA was not the least restrictive means to meet the state's compelling interest of protecting the public from high-risk juvenile sexual offenders, "because the overwhelming majority of juvenile offenders are not 'high risk'." Appellees' Brief in *In re J.B.*, at 28. Appellee's argument here, as in *In re J.B.*, is predicated on an alleged erroneous presumption that sex offenders pose a high risk of reoffense, and because all the tribunals who have spoken to the issues in this case, including our Court in *Torsilieri I* and the trial court's opinion upon remand, addressed the irrebuttable presumption doctrine, we consider Appellee's "independent" argument to be synonymous with the irrebuttable presumption challenge, and analyze it solely as such.[12]

Thus, we turn to the irrebuttable presumption inquiry. Statutes creating irrebuttable presumptions are not *per se* violative of the constitution. *See Weinberger v. Salfi,* 422 U.S. 749 (1975). Indeed, legislatures enact statutes which make a myriad of distinctions based upon narrowly distinguishable, similarly-situated entities. Age classifications, including minimum ages to engage in a wide range of conduct, and mandatory retirement ages or ineligibilities for appointment, are typical examples. Other presumptions are

---

[12] As we do not address Appellee's challenge under substantive due process principles, but, rather, do so under the irrebuttable presumption doctrine, we need not address Appellee's assertion that our Court should apply strict scrutiny in analyzing Subchapter H.

based upon acts, such as the prohibition on those who have been convicted of various offenses from possessing or using firearms.  18 Pa.C.S. § 6105.

From the late 1960s to the mid-1970s, the United States Supreme Court applied the irrebuttable presumption doctrine when faced with legislation containing rules denying a benefit or placing a burden on all individuals with certain characteristics.  Writ large, an irrebuttable presumption doctrine claim may arise whenever "a provision states or implies that one fact (the basic fact) is conclusive evidence of another fact (the presumed fact) that provides the ostensible rationale for the classification established by the provision." John M. Phillips, *Irrebuttable Presumptions: An Illusory Analysis*, 27 Stan. L. Rev. 449, 451 (1975).  In this way, "[t]he characteristic is seen as the 'basic fact,' from which the 'presumed fact'--possession of whatever quality is relevant to the postulated ultimate purpose--is inferred."  Note, *The Irrebuttable Presumption Doctrine in the Supreme Court*, 87 Harv. L. Rev. 1534, 1534 (1974).  When a legislative scheme employs presumptions that are overinclusive, the irrebuttable presumption doctrine requires that an individual have the opportunity to rebut that presumption.

More specifically, the irrebuttable presumption doctrine derives from a series of United States Supreme Court cases involving statutes that infringed upon protected interests or denied benefits by utilizing presumptions that the existence of one fact was statutorily conclusive of the truth of another fact.  The high Court concluded that, absent a meaningful opportunity to contest the validity of the second fact, the statutory irrebuttable presumptions deprived the citizenry of due process of law. *See, e.g., Vlandis v. Kline,* 412 U.S. 441 (1973) (holding statute unconstitutional for employing irrebuttable presumption that those who lived out-of-state when they applied to a state university should be forever deemed out-of-state residents for purposes of tuition calculation, even if they later become *bona fide* residents); *Stanley v. Illinois, supra* (holding

unconstitutional statute providing for children to be declared dependent and removed from their unwed fathers' custody based on the presumption that unwed fathers are unfit parents); *Bell v. Burson,* 402 U.S. 535 (1971) (concluding that due process was violated by statute requiring the suspension of a driver's operating privileges following an accident, if the driver did not carry insurance or post security, without providing a pre-suspension forum for determining whether the driver was likely to be held at fault); *see generally In re J.B.*, *supra* (discussing this history).

However, in the late 1970s and 1980s, the high Court brought the continued viability and utility of the irrebuttable presumption doctrine into question. Grave concerns were voiced by certain members of the Court that the breadth of the doctrine would undermine the prior well-established substantive due process analysis. *Vlandis*, 412 U.S. at 459-69 (Burger, C.J., dissenting). Indeed, the doctrine was described as "a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with . . . the Constitution." *Weinberger*, 422 U.S. at 772. The *Weinberger* decision marked the trend to limit the irrebuttable presumption doctrine, and, 12 years later, the Court was unable to agree on its applicability in *Michael H. v. Gerald D.,* 491 U.S. 110, 121 (1989) (plurality) (rejecting the application of the doctrine and using the rational basis test in a paternity contest between natural father and husband of mother, wherein four Justices, *inter alia,* focused on the fit between the classification and the policy that the classification served).

More recent federal decisions have been critical of the doctrine's value as a jurisprudential construct and have signaled the *de facto* end to the use of the irrebuttable presumption doctrine. *See Catlin v. Sobol,* 93 F.3d 1112, 1118 (2d Cir. 1996) ("Irrebuttable presumption analysis allowed the Court to overturn legislative decisions without having to justify the use of judicial power as would an open use of substantive

due process or equal protection analysis. The use of irrebuttable presumption language was a conceptually confused, if not dishonest, method of justifying independent judicial review of legislative classifications."). Indeed, certain courts have questioned whether the irrebuttable presumption doctrine is obsolete. *See Black v. Snow,* 272 F. Supp. 2d 21, 30 (D.D.C. 2003) (opining that "the irrebuttable presumption analysis has simply collapsed into the ordinary equal protection/due process analysis" except in cases involving fundamental interests), *aff'd Black v. Ashcroft,* 110 Fed. Appx. 130 (D.C. Cir. 2004) (affirming *per curiam* in an unpublished decision, specifically not addressing the due process claim); *see also In re J.B.,* 107 A.3d at 12 n.22, 14 n.24 (questioning the viability of the irrebuttable presumption doctrine). Academic commentators have been critical of the doctrine as well. *See generally* Randall Bezanson, *Some Thoughts on the Emerging Irrebuttable Presumption Doctrine*, 7 Ind. L. Rev. 644, 654 (1974) (warning that the irrebuttable presumption doctrine "could invalidate all [over broad] classifications and require that opportunity always be provided for individualized exemptions from the statute"); *but see* Catherine Carpenter, *Panicked Legislation*, 49 JLEGIS 1, 44-51 (2022) (urging use of the irrebuttable presumption doctrine in the wake of hastily crafted legislation to appease a fearful public); Jonathon Chase, *The Premature Demise of Irrebuttable Presumptions*, 47 U. Colo. L. Rev. 653, 705 (1976) (suggesting the irrebuttable presumption doctrine provided a valuable addition to the evolution of substantive due process).

Nevertheless, our Court has continued to employ the doctrine. *See*, *e.g.*, *In re J.B., supra*; *Clayton*, *supra*. Moreover, the parties do not contest its continued vitality in this appeal. Thus, we will address the irrebuttable presumption doctrine issue as presented and await another day to explore the doctrine's continued viability in Pennsylvania.

In adopting SORNA, the General Assembly set forth legislative findings and a declaration of policy in which it explained that compliance with the federal Adam Walsh Child Protection and Safety Act, and the increased regulation of sex offenders in nonpunitive fashion, would provide increased protection to the citizens of the Commonwealth. Specifically, Subchapter H provides:

> **(a) Legislative findings.--**The General Assembly finds as follows:
>
> (1) In 1995 the General Assembly enacted the act of October 24, 1995 (1st Sp.Sess. P.L. 1079, No. 24), commonly referred to as Megan's Law. Through this enactment, the General Assembly intended to comply with legislation enacted by Congress requiring that states provide for the registration of sexual offenders. The Federal statute, the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act (Public Law 103-322, 42 U.S.C. 14071 et seq.), has been superseded by the Adam Walsh Child Protection and Safety Act of 2006 (Public Law 109-248, 120 Stat. 587).
>
> (2) This Commonwealth's laws regarding registration of sexual offenders need to be strengthened. The Adam Walsh Child Protection and Safety Act of 2006 provides a mechanism for the Commonwealth to increase its regulation of sexual offenders in a manner which is nonpunitive but offers an increased measure of protection to the citizens of this Commonwealth.
>
> (3) If the public is provided adequate notice and information about sexual offenders, the community can develop constructive plans to prepare for the presence of sexual offenders in the community. This allows communities to meet with law enforcement to prepare and obtain information about the rights and responsibilities of the community and to provide education and counseling to residents, particularly children.
>
> (4) *Sexual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest.*

(5) Sexual offenders have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government.

(6) Release of information about sexual offenders to public agencies and the general public will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems so long as the information released is rationally related to the furtherance of those goals.

(7) Knowledge of whether a person is a sexual offender could be a significant factor in protecting oneself and one's family members, or those in care of a group or community organization, from recidivist acts by such offenders.

(8) The technology afforded by the Internet and other modern electronic communication methods makes this information readily accessible to parents, minors and private entities, enabling them to undertake appropriate remedial precautions to prevent or avoid placing potential victims at risk.

42 Pa.C.S. § 9799.11(a) (emphasis added and footnote omitted).  Moreover, the General

Assembly set forth the following declaration of policy:

**(b) Declaration of policy.--**The General Assembly declares as follows:

(1) It is the intention of the General Assembly to substantially comply with the Adam Walsh Child Protection and Safety Act of 2006 and to further protect the safety and general welfare of the citizens of this Commonwealth by providing for increased regulation of sexual offenders, specifically as that regulation relates to registration of sexual offenders and community notification about sexual offenders.

(2) It is the policy of the Commonwealth to require the exchange of relevant information about sexual offenders among public agencies and officials and to authorize the release of necessary and relevant information about sexual offenders to members of the general public as a means of assuring public protection and shall not be construed as punitive.

(3) It is the intention of the General Assembly to address the Pennsylvania Supreme Court's decision in *Commonwealth v.*

*Neiman,* No. 74 MAP 2011 (Pa. 2013), by amending this subchapter in the act of March 14, 2014 (P.L. 41, No. 19).

(4) It is the intention of the General Assembly to address the Pennsylvania Supreme Court's decision in *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017) and the Pennsylvania Superior Court's decision in *Commonwealth v. Butler* (2017 WL 4914155).

**(c) Scope.--**This subchapter shall apply to individuals who committed a sexually violent offense on or after December 20, 2012, for which the individual was convicted.

*Id.* § 9799.11(b), (c).

In line with the federal mandate, the Act created a three-tier registration system based upon the underlying criminal offense, with Tier III applying to the most severe sexual offenses. *Id.* § 9799.14. The duration and frequency of the periodic reporting requirements vary across the tiers, with Tier 1 offenders required to report annually for 15 years, Tier II offenders reporting semiannually for 25 years, and Tier III offenders reporting quarterly for their lifetimes. *Id.* § 9799.15(a). This provision also dictates various events necessitating in-person reporting, such as a change in name, address, employment, telephone number, email address, or significant change in physical appearance. *Id.* § 9799.15(g); *id.* § 9799.16(c)(4). An offender that is required to register is subject to criminal prosecution for failure to do so under 18 Pa.C.S. § 4915.1.

Of particular focus herein, the General Assembly additionally declared, as discussed above, "Sexual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." 42 Pa.C.S. § 9799.11(a)(4). In furtherance of this purpose, SORNA establishes that a state-wide registry of sexual offenders is to be maintained by the PSP and dictates a substantial list of information regarding the offender to be included on the registry. *Id.* § 9799.16. Significantly, the Act requires that the PSP develop a system that disseminates the registrants' information to the public through a website and

allows the public to search that information by "any given zip code or geographic radius set by the user." *Id.* § 9799.28. This information must be connected with registries maintained by the Department of Justice as well as other jurisdictions. *Id.* § 9799.16(a). The PSP is obligated to make the information available to the jurisdiction where the individual resides, is employed, or is enrolled as a student, and any jurisdiction where the individual has terminated residence, employment, or enrollment. *Id.* § 9799.18(a)(1)-(2). Furthermore, the PSP is also required to provide the information to the United States Attorney General, the Department of Justice, and the United States Marshals Service for inclusion in federal databases. *Id.* § 9799.18(a)(3). Additionally, information is provided to the relevant district attorney, the chief law enforcement officer, and the probation and parole office where the individual resides, is employed, or is enrolled as a student. *Id.* § 9799.18(a)(4)-(6). Information gained through the registry is not posted by the PSP on a public internet website; nevertheless, there is no prohibition against public distribution of the information by any entity to which the PSP is required to provide the information.

Of direct relevance to this appeal, in *In re J.B.*, our Court addressed the question of whether the irrebuttable presumption that juvenile offenders "pose a high risk of committing additional sexual offenses," thereby subjecting them to lifetime registration, denied them due process because it impaired their right to reputation protected by Article I, Section 1 of the Pennsylvania Constitution. We opined that, to establish a violation of the doctrine, a challenging party must satisfy the three-prong test of demonstrating: (1) a protected interest, (2) a presumption that is not universally true, and (3) reasonable alternative means to ascertain the presumed fact. 107 A.3d at 15-16. Applying the first element of this test, this Court first concluded that the juveniles in *In re J.B.* had demonstrated a protected interest in their right to reputation, which is protected as a fundamental right under the Pennsylvania Constitution. *Id.* at 16. We additionally opined

that their right to reputation had been infringed by the statutory declaration "that sexual offenders, including juvenile offenders, 'pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest.'" *Id.* (citing 42 Pa.C.S. § 9799.11(a)(4)).

This Court next considered whether the presumption of a high risk of recidivism was universally true when applied to juveniles convicted of sexual offenses. We observed that the trial court credited research which indicated that juveniles offend as a result of impulsivity and curiosity, both of which diminish with rehabilitation and maturation. Comparing juveniles to adults, we found that, "[w]hile adult sexual offenders have a high likelihood of reoffense," juvenile sex offenders exhibited low levels of recidivism "which are indistinguishable from the recidivism rates for non-sexual juvenile offenders, who are not subject to SORNA registration." *Id.* at 17. Importantly, our Court's decision was informed by support from then-recent United States Supreme Court decisions recognizing the fundamental differences between juveniles and adults, including greater impulsivity due to lack of maturity, increased vulnerability to negative influences, and malleability of character. *Id.* at 18-19. We explained that the trial court opined that "these distinctions between adults and juveniles are particularly relevant in the area of sexual offenses, where many acts of delinquency involve immaturity, impulsivity, and sexual curiosity rather than hardened criminality." *Id.* at 19. Given this overwhelming consensus of corroborated research, our Court determined the statutory presumption that juvenile sexual offenders were at high risk of recidivating was not universally true.

Finally, we evaluated whether reasonable alternative means existed to ascertain whether a juvenile offender was at high risk of recidivism. The Court explained that SORNA already provided for individualized assessment of adult sexual offenders as sexually violent predators and juvenile offenders as sexually violent delinquent children.

Therefore, our Court found the juveniles satisfied the three-prong irrebuttable presumption test. *Id*. at 19-20.

In *Torsilieri I*, our Court first considered this same irrebuttable presumption analysis as applied to adults. The trial court, as noted above, found all three prongs of the doctrine to have been satisfied, and concluded that SORNA's registration and notification provisions involved an unconstitutional irrebuttable presumption, relying heavily on the scientific evidence proffered by Appellee. Our Court declined to render a legal conclusion at that juncture, believing we were unable to analyze Appellee's challenge based upon the record currently before us, and, specifically, whether Appellee had sufficiently undermined the validity of the legislative findings supporting Subchapter H's registration and notification provisions and the effectiveness of a tier-based registration system, especially in light of contradictory scientific evidence cited by the Commonwealth on appeal which facially refuted the Appellee's evidence. *Torsilieri I*, 232 A.3d at 587-88. Thus, our Court remanded the matter to allow the parties to develop arguments and present additional evidence. *Id.* at 596. As set forth in detail above, on remand the trial court found that the presumption violated the Constitution.

Thus, with our Court's prior opinion and the trial court's determination after remand in hand, we turn to an analysis of the three-prong construct for considering the constitutionality of Subchapter H's irrebuttable presumption. For purposes of this appeal, we need focus only on the second prong — whether the presumption is universally true.[13]

---

[13] As to the first prong, the parties do not meaningfully dispute that the right to reputation is protected by the due process clause and that the designation as a sexual offender, based upon a presumption of posing a high risk of recidivism, impacts one's right to reputation. *See In re J.B.*, 107 A.3d at 16 (making this finding with respect to juvenile offenders). Additionally, while we need not reach the third prong of the analysis based upon our resolution of the second prong, we note that, in *In re J.B.*, we found the third prong satisfied, as SORNA already provided for individualized assessment of adult sexual (continued…)

The second prong has been subjected to scant analysis. The United States Supreme Court employed the "necessarily or universally true, in fact" standard in *Vlandis v. Kline*, *supra*. In *Vlandis*, the Supreme Court held that a state could not irrebuttably presume that a person, who had lived outside of the state for any part of the year preceding his application to a state college, was a non-resident student for purposes of fixing his tuition rate. The *Vlandis* Court concluded:

> [Connecticut] is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, *when that presumption is not necessarily or universally true, in fact, and when the State has reasonable alternative means of making the crucial determination*. Rather, standards of due process require that the State allow such an individual the opportunity to present evidence showing that he is a bona fide resident entitled to the in-state rates.

412 U.S. at 452 (emphasis added).

It is not lost on our Court that the "necessarily or universally true, in fact" standard seemingly demands that the presumption be true throughout a class, without exception. Perhaps recognizing the practical reality of virtually no presumption being always true, the United States Supreme Court, in at least one case, has suggested a less demanding standard. *See U. S. Department of Agriculture v. Murry*, 413 U.S. 508, 514 (1973) ("We conclude that the deduction taken for the benefit of the parent in the prior year is not a rational measure of the need of a different household with which the child of the tax-deducting parent lives and rests on an irrebuttable presumption *often contrary to fact*." (emphasis added)).

---

offenders as sexually violent predators and juvenile offenders as sexually violent delinquent children. *Id*. at 19.

Our Court also has seemingly recognized the impracticality of such an understanding of this second prong. As noted above, *In re J.B.* focused on whether there was a *consensus* regarding the potential recidivism of juvenile sex offenders. Similarly, in this matter, our Court explained that, for Appellee to satisfy this second element, he must establish a *consensus* of scientific evidence rebutting the presumption as to the class of adult sex offenders (that they are at high risk of reoffending). *Torsilieri I*, 232 A.3d at 583.

In explaining this "consensus" burden, our Court in *Torsilieri I* was specific and clear regarding the relevant question to be answered on remand: "whether sexual offenders commit more sexual crimes than other groups not subject to similar registration laws." *Id*. at 594 n.22; *see also id.* at 606 (Donohue, J., dissenting) (agreeing that the operative inquiry was whether sex offenders are committing new sex crimes at a higher rate than those who are convicted of non-sexual offenses, thereby justifying the legislature's differential treatment). Indeed, this was the same discrete inquiry undertaken by our Court in *In re J.B. See* 107 A.3d at 17 (finding a scientific consensus that juveniles convicted of sexual crimes commit new sexual crimes at a rate "indistinguishable" from juvenile non-sexual offenders).

Thus, to meet his heavy burden of establishing that the General Assembly's presumption was not universally true, Appellee was required to establish that there exists a scientific consensus that sexual offenders pose no greater risk of committing additional sexual crimes than other groups not subject to similar registration laws. Informing our understanding of our Court's mandate and this prong of the irrebuttable presumption doctrine, we simply add that a "consensus" is a generally accepted opinion or general agreement regarding a proposition. *See* Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/consensus; Dictionary.com

https://www.dictionary.com/browse/consensus; The Britannica Dictionary, https://www.britannica.com/dictionary/consensus.

Appellee, however, as discussed, rejects our framing of the question at issue as whether sexual offenders are more likely to commit additional sexual crimes than non-sex offenders, and instead urges a focus on individual variation within those convicted of sexual offenses and submits that Subchapter H is unconstitutional because it fails to take into account individualized recidivism risk. In support thereof, he presented expert testimony which focused upon recidivism rates within the sex offender community, offering that only 5% to 20% of sex offenders were arrested for a subsequent sex offense.

However, we remanded for evidence and argumentation regarding the issue as we framed it. This is because the General Assembly deemed sexual offenders to be a special class that presented unique risks, justifying different treatment than non-sexual offenders. To overturn the legislative presumption that sex offenders are more likely as a group to commit new sex offenses, we must conclude there is a universal consensus that this presumption is wrong. There cannot be a mere disagreement among experts; there must be clear and indisputable evidence for us to take this extraordinary step, as the General Assembly made a considered policy choice that sex crimes were uniquely abhorrent to the victims and society, and relying on the presumption that, as a group, those who commit such crimes are more likely to commit another crime of a sexual nature.

Again, the meaningful statistical measure is whether the percentage of those who have committed a sexual offense and go on to commit a second sexual offense — the group SORNA targets — is higher than the percentage of those who first commit a non-sexual offense followed by a second, sexual offense. It is this presumed difference in the rates of commission of sexual offenses, as recidivist offenses, between the two groups of offenders on which the legislature rested SORNA's registration and notification scheme.

Here, Appellee's own experts concede that adult sexual offenders reoffend at a rate of at least three times higher than other individuals convicted of non-sexual offenses. *See* Hanson Testimony, N.T. 6/28/21, at 217; LeTourneau Testimony, N.T. 6/29/21, at 83; Prescott Testimony, N.T. 6/29/21, at 274. Accordingly, rather than refuting it, the evidence *supports* the legislative presumption; the evidence validates the statutory underpinnings of Subchapter H.[14] We need go no further. Having reviewed the arguments and the evidence presented below, we find that the evidence does not demonstrate a consensus that the presumption at issue is not universally true. Thus, we hold that Appellee has failed to meet his heavy burden to demonstrate that the irrebuttable presumption at issue was constitutionally infirm.

## VI. Issue II

We now turn to the second issue before our Court: whether the trial court erred in determining that the registration and notification requirements of Subchapter H are punitive. Importantly, Appellee's other constitutional challenges — regarding the separation of powers doctrine, the United States Constitution's prohibition on cruel and unusual punishment, and the right to a trial by jury — depend upon a determination that Subchapter H is punitive legislation.[15] This question presents a pure question of law for which our scope of review is plenary, and our standard of review is *de novo*. *LaCombe*, 234 A.3d at 608.

---

[14] By contrast, in *In re J.B.* where we engaged in a similar analysis, we came to a contrary conclusion. Therein, the statistical evidence showed that juvenile sex offenders were no more likely to commit subsequent sexual offenses than juveniles who committed non-sexual offenses. In that case, the evidence was clear, based upon a demonstrated consensus, that the presumption was not justified.

[15] As we discuss below, Appellee also contends that, independent of whether Subchapter H is deemed to be punitive, SORNA's mandatory lifetime sex offender registration constitutes cruel and disproportionate punishment under the Eighth Amendment to the United States Constitution. See *infra* note 18.

## A. Mendoza-Martinez Factors

We first note that the long history of Pennsylvania's sexual offender regulatory statutes and this Court's interpretations of those statutes as being punitive, or not, has been fully and ably recounted in numerous decisions. *See, e.g., Torsilieri I*, 232 A.3d at 575-79; *LaCombe*, 234 A.3d at 608-13; *id*. at 629-41 (Wecht, J., dissenting). Thus, we need not repeat that legacy here, but advance to consideration of whether the requirements of Subchapter H constitute criminal punishment under the test set forth in *Mendoza-Martinez*. The two-part test consists of first determining whether the expressed statutory purpose is to impose punishment, and if not, whether the statutory scheme is so punitive in effect as to negate the legislature's stated non-punitive intent, as assessed by the seven *Mendoza-Martinez* factors. *LaCombe*, 234 A.3d at 614. Because the first part of this test is largely undisputed, our focus is on these factors.

Initially, it is instructive to review *Muniz* and *LaCombe*, the two most recent decisions by our Court in which we considered whether certain iterations of SORNA were punitive in nature. In *Muniz*, a plurality of our Court was faced with an *ex post facto* challenge to SORNA and concluded that the registration provisions constituted punishment. 164 A.3d at 1218. After first observing that the legislature's expressed intent was not to impose punishment, the OAJC proceeded to consider its punitive effect by analyzing the *Mendoza-Martinez* factors. The Court found that the statute imposed an affirmative disability or restraint upon offenders due to the onerous in-person reporting requirements for both initial verification and changes to an offender's registration, stressing that a Tier III offender would be required to report in person a minimum of 100 times over a 25-year period. The OAJC determined that SORNA's requirements were analogous to historical forms of punishment, specifically finding the statute's "publication provisions — when viewed in the context of our current internet-based world — to be

comparable to shaming punishments" and the mandatory notification conditions placed on registrants to be akin to probation. *Id*. at 1213. Furthermore, the OAJC developed that SORNA promotes the traditional aims of punishment as "the prospect of being labeled a sex offender accompanied by registration requirements and the public dissemination of an offender's personal information over the internet has a deterrent effect." *Id*. at 1215. The OAJC found that the General Assembly increased the retributive effect of SORNA as compared to Megan's Law II by "increas[ing] the length of registration, [adding] mandatory in-person reporting requirements, and allow[ing] for more private information to be displayed online." *Id*. at 1216 (citation omitted).

In deferring to the General Assembly, however, the OAJC also concluded the protection of the public from sex offenders "is a purpose other than punishment to which the statute may be rationally connected and that this factor weighs in favor of finding SORNA to be nonpunitive." *Id*. at 1217.

Finally, the OAJC determined that SORNA's registration requirements were excessive and over-inclusive in relation to the statute's intended purpose of protecting the public, as it "categorize[d] a broad range of individuals as sex offenders subject to its provisions, including those convicted of offenses that do not specifically relate to a sexual act." *Id*. at 1218. Therefore, the plurality concluded that SORNA's registration requirements constituted criminal punishment and that their retroactive application constituted a violation of the constitutional prohibition against *ex post facto* laws. *Id*.

In response to *Muniz*, as noted above, the General Assembly enacted Subchapter I, and amended Subchapter H. In this amended statutory scheme, the General Assembly, *inter alia*, eliminated a number of crimes that previously triggered application of SORNA's registration and notification requirements, and reduced the frequency with which an offender must report in person to the PSP.

In *LaCombe*, we considered the constitutionality of Subchapter I, and again, after first finding the General Assembly's expressed intent was not to punish registrants, we analyzed the punitive nature of the statute by assessing the *Mendoza-Martinez* factors. 234 A.3d 618. As to the first factor, we emphasized Subchapter I's significant decrease in the number of in-person visits. Coupled with our view that the remaining requirements were minimal and necessary, we found Subchapter I did not impose an affirmative disability or restraint upon the registrant, *id*. at 617-18, and, thus, that this factor weighed in favor of finding the statute to be nonpunitive. On the second factor, we concluded there was no reason to depart from *Muniz*'s determination that the requirements were akin to public shaming, due to the publicity and resulting stigma caused by registration information being posted on the internet, and similar to probation, in light of the onerous notification requirements and the criminal penalties for violation of the reporting requirements.[16]

We then turned to the fourth factor: whether Subchapter I promoted the traditional aims of punishment — retribution and deterrence. While determining that Subchapter I promoted retribution, we explained that Subchapter I applied solely to offenders who had already committed crimes — those committed prior to December 20, 2021 — thus, registrants could not be deterred by the registration requirements from committing crimes, as those crimes had already occurred. *Id*. at 624. Accordingly, weighing this factor in favor of finding Subchapter I to be punitive, we gave it little weight, as the statute was not aimed at deterrence. We then proceeded to factor 6, finding an alternative purpose other than punishment to which Subchapter I was connected: protecting and informing the public regarding sexual offenders the legislature believed to be dangerous. Thus, this

---

[16] As we discuss below regarding *Torsilieri I*, in *LaCombe*, we found that factors 3 and 5 were of little significance to the inquiry in this context, and, thus, we assigned these factors little weight. *LaCombe*, 234 A.3d at 603-04, 606.

factor weighed in favor of finding Subchapter I to be nonpunitive. Finally, the *LaCombe* Court considered factor 7, whether Subchapter I was excessive in relation to this alternative purpose. We relied upon the General Assembly's removal of certain previously qualifying offenses, its lowering of the registration term for various offenses, and its providing of a removal mechanism for lifetime registrants. Based on these considerations, we opined that this factor weighed heavily in favor of finding Subchapter I to be nonpunitive. Balancing the *Mendoza-Martinez* factors, we concluded that Subchapter I was nonpunitive.

With this background in hand, we turn to the first part of the *Mendoza-Martinez* two-part inquiry, which first asks whether the General Assembly, by enacting SORNA, intended to impose punishment — that is, to punish sexual offenders — and, if not, asks whether the legislative construct is nevertheless so punitive as assessed by the *Mendoza-Martinez* factors, either in purpose or effect, so as to vitiate the legislature's intent. *Torsilieri I*, 232 A.3d at 588; *Lacombe*, 234 A.3d at 618.

Here, the clearly expressed legislative purpose, findings, and declaration of policy all establish that, rather than intending to punish, the General Assembly desired to enact a civil, regulatory scheme. The parties do not disagree. Specifically, the General Assembly's purpose in enacting Subchapter H can be discerned through its unambiguous statement that the provisions of Subchapter H "shall not be construed as punitive." 42 Pa.C.S. § 9799.11(b)(2). Moreover, the legislature offers that "[i]t is the intention of the General Assembly to substantially comply with the Adam Walsh Child Protection and Safety Act of 2006 and to further protect the safety and general welfare of the citizens of this Commonwealth by providing for increased regulation of sexual offenders, specifically as that regulation relates to registration of sexual offenders and community notification about sexual offenders." *Id.* § 9799.11(b)(1). Significantly, the General Assembly

clarified that, in enacting Subchapter H and Subchapter I, its intent was "to address the Pennsylvania Supreme Court's decision in *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017) and the Pennsylvania Superior Court's decision in *Commonwealth v. Butler* [173 A.3d 1212 (Pa. Super. 2017)]," which both found the prior iteration of SORNA to be unconstitutional based upon a determination that it was punitive. 42 Pa.C.S. § 9799.11(b)(4). Thus, manifestly, the General Assembly's intent in revising Subchapter H was non-punitive.

Accordingly, we turn to the second part of the analysis: application of the *Mendoza-Martinez* factors designed to aid a court in analyzing whether a "statutory scheme is nonetheless so punitive either in purpose or effect as to negate the legislature's non-punitive intent." *Williams II*, 832 A.2d at 971. Only the "clearest proof" of the punitive effect of a law will overcome its expressed non-punitive intent, and we must examine the entirety of the statutory scheme in order to make this assessment. *Muniz*, 164 A.3d at 1208. For each factor, we will set forth the trial court's findings, as well as the arguments by the Commonwealth and Appellee. As we found in *Torsilieri I*, factors 3 and 5 are of little significance to our inquiry, and, thus, we assign these factors little weight and do not further analyze them below. 232 A.3d at 589.

**Factor 1: Whether Subchapter H involves an affirmative disability or restraint**

The first *Mendoza-Martinez* factor contemplates whether the challenged statute imposes an affirmative disability or restraint upon a sexual offender. The trial court noted the Subchapter H provisions require Tier III registrants to appear before the PSP quarterly each year for verification purposes and to appear in person to update his or her registration information as to residence, employment, vehicle ownership, and significant change in physical appearance. After three years of compliance, the number of in-person appearances is reduced to one per year, if the person has not been convicted of an

offense with a term of imprisonment of one year or more, but the offender must still report telephonically three other times during the year. The court found that the cumulative effect of these reporting requirements is to put the registrant on *de facto* probation for the rest of his or her life. As explained by the trial court, the registrant must report every change in employment, residence, appearance, *etc.*, to the PSP for the rest of their lives, and this information, along with their residence, is disseminated to the world via the internet. The trial court found these burdens oppressive. It was not persuaded that the mere fact that a registrant could challenge his or her future dangerousness after 25 years, and potentially be relieved of this burden, operated to meaningfully alleviate it. The court characterized this avenue of prospective relief as illusory, given that the 25-year period would likely stigmatize the offender during the most productive years of his life. Thus, the trial court concluded that this factor weighed in favor of finding the registration and notification provisions to be punitive.

Initially, the Commonwealth contends that Appellee failed to demonstrate a punitive nature by the "clearest proof," and stresses that, in analyzing this factor, both the trial court and Appellee failed to appreciate that the purpose of the statute is to protect the public through information sharing, not by reducing recidivism. With respect to this *Mendoza-Martinez* factor, the Commonwealth maintains that Subchapter H does not impose an affirmative disability or restraint upon a sexual offender. The Commonwealth points to *Williams II*, where our Court held that, if the disability or restraint is minor, its effects are unlikely to be punitive. In that vein, the Commonwealth reminds that, in *Lacombe,* which addressed the punitive nature of Subchapter I, our Court placed great weight on the fact that the number of in-person registration visits to the PSP had been reduced, relative to the first incarnation of SORNA, from a minimum of 100 visits over 25 years to 25 visits over 25 years, *i.e.*, one per year. The Commonwealth offers that, for

this 25-year period, Subchapter H drastically reduces the minimum number of in-person visits for Tier III registrants to 34, compared to the original version of SORNA, and to 28 visits for Tier II registrants.[17]  Thus, the Commonwealth maintains that the in-person visits under Subchapter H are virtually the same as those under Subchapter I.  Related thereto, the Commonwealth posits that the addition of a removal provision invocable after 25 years, which we found significant in *LaCombe* in finding that Subchapter I was non-punitive, should equally apply here.  The Commonwealth disputes the trial court's conclusion that the requirement that offenders appear in person whenever they have significant life changes is oppressive.  The Commonwealth submits that such information is necessary to ensure that the registry is current, and that in-person visits are no more oppressive than similar tasks that one would normally have to perform in life — regardless of registration — such as completing legal documents, transferring money, and notifying insurance companies.

Appellee counters by asserting, broadly, that the purpose of the registration and notification provisions is punitive because, in his view, the empirical evidence shows no real relationship between these provisions and the reduction of recidivism, which, again, he contends is SORNA's primary purpose.  Appellee argues that the reporting requirements of Subchapter H are more akin to the affirmative disability imposed by SORNA in *Muniz* than in Subchapter I, and points out that, under Subchapter H, in-person appearances are still required quarterly or semi-annually.  Appellee adds that the telephonic registration and notification option to reduce in-person visits is not available until after three years of compliance, and, in any event, is currently not operational,

---

[17] This reduction in the minimum number of in-person visits resulted from appearances being permitted by telephone.  Telephonic visits may occur after three years for registrants qualified for reduced in-person reporting.  42 Pa.C.S. § 9799.25(a.1).

despite Subchapter H being enacted over five years ago.  Moreover, Appellee highlights that the law does not make allowances for homeless registrants.

We find persuasive the fact that Subchapter H reduces, for the first 25-year period, the minimum number of in-person visits for Tier III registrants to 34 from the original version of SORNA, and to 28 visits for Tier II registrants.  42 Pa.C.S. § 9799.15(e).[18] While not as low as the annual in-person visitation requirement in Subchapter I before the Court in *LaCombe*, which led our Court to find those provisions to be non-punitive, we nevertheless find that this reduced number of visits does not impose an affirmative disability or restraint upon a sexual offender so as to be punitive.  Moreover, we find significant the addition of the 25-year removal provision to Subchapter H.  *Id*. § 9799.15(a.2).  We relied upon such a removal provision in *LaCombe* in concluding that Subchapter I was non-punitive, and do the same here.  Thus, as in *LaCombe*, we similarly find this first factor weighs in favor of finding Subchapter H to be nonpunitive in nature.

### Factor 2:  Whether Subchapter H's requirements have historically been regarded as punishment

The second *Mendoza-Martinez* factor assesses whether the sanction at issue traditionally has been regarded as punishment.  In making this assessment with respect to SORNA, our Court has historically focused on two aspects:  (1) whether the scheme at issue mimicked historical forms of public shaming; and (2) whether the scheme significantly resembled probationary sentences.

The trial court noted that, in *Lacombe*, our Court concluded that SORNA's publication provisions, in light of the widespread reach of the internet, were comparable to shaming and were similar to probation, and that the registration and notification requirements of SORNA have historically been regarded as punishment.  That, coupled

---

[18] At a minimum, a Tier I registrant still must appear annually.  42 Pa.C.S. § 9799.15(e).

with the fact that penalties for violating these provisions are located in the Crimes Code, compelled the trial court to conclude that this second factor weighed in favor of finding that Subchapter H's registration and notification requirements were punitive in nature.

The Commonwealth acknowledges that, in *LaCombe*, our Court recognized that the registry was akin to a form of public shaming. It asserts, however, that we should revisit that conclusion. Specifically, the Commonwealth recognizes our Court's concern regarding the registry's availability on the internet, but contends that the registry is not a search engine, that offenders' names do not appear in search engines, and that the registry is not accessible to search engines. Rather, the Commonwealth insists that the only way to obtain information from the registry is to learn of the registry's existence and search the website. The Commonwealth adds that, if one accesses the sex offender database, one must agree that they will not use this information to harass or engage in other unlawful conduct towards the offender. The Commonwealth asserts that Appellee's experts offered no evidence to support the assertion that the registry spreads information on the internet.

Using an analogy, the Commonwealth points to the Pennsylvania Disciplinary Board website which provides information to the public regarding attorneys who have been subject to disciplinary action, and allows the public to search the website by name, attorney registration number, or geographic location, or, in the alternative, to view all recent disciplinary actions. The Commonwealth proffers that the Disciplinary Board website does not constitute punishment, but instead, like SORNA, provides a benefit to the public by offering information. While a disciplined attorney or sex offender registrant's presence on a website may be "shameful," the Commonwealth avers that it is not because of the presence on the website, but because of the underlying misconduct. Finally, the Commonwealth rejects the trial court's assertion that offenders are subject to increased

incidents of harassment or discrimination, and argues that Appellee failed to provide any data regarding how many individuals visit the website or, of those that visit the website, how many have used it to discriminate against sex offenders. Even if sex offenders experience such ostracism, the Commonwealth claims that it is not the fault of the registry, but a direct consequence of their sexual crimes.

Appellee takes issue with the Commonwealth's suggestion that we should revisit our most recent reaffirmation in *Lacombe* that the registration and notification requirements constitute a form of public shaming and were akin to probation. Appellee points out that even the less onerous requirements of Subchapter I were found to be punitive in this regard. Moreover, Appellee stresses that the purpose of the PSP website is to spread information publicly, which undermines the Commonwealth's argument that access to it is limited. Thus, Appellee maintains that the registry is similar to shaming and probation.

Given the continued widespread dissemination of registry information to the public through the internet, which we deemed to be comparable to shaming punishments in *LaCombe*, and Subchapter H's continued requirements for registration and notification regarding, for example, changes in a registrant's residence and employment, and given its probation-like criminal penalties for noncompliance, we see no reason to deviate from our recent determination in *LaCombe* that this factor weighs in favor of finding Subchapter H's effect to be punitive.

**Factor 4: Whether the operation of Subchapter H promotes the traditional aims of punishment**

The fourth *Mendoza-Martinez* factor asks whether the challenged statute operates in a manner that promotes the traditional aims of punishment. The trial court concluded that the registration and notification requirements promoted the traditional aims of punishment — retribution and deterrence. The court emphasized that our Court in

*LaCombe* gave little weight to this factor, as Subchapter I applied to crimes for which the offenders already had to register. As the crimes had already occurred, there was little deterrent effect to the requirements of Subchapter I. In comparison, the court explained that Subchapter H has a deterrent effect, as registration and notice do not occur until a crime has been committed. Moreover, the court reasoned the requirements for a Tier III registrant promotes retribution because the designation as a lifetime registrant brands the person a "high-risk, dangerous and incorrigible sex offender of whom citizens must always be wary." Trial Court Opinion, 8/22/22, at 21. According to the trial court, this subjects the person to public shaming and marginalization for life, which is unquestionably retributive.

The Commonwealth argues that the registration and notification requirements do not promote the traditional aims of punishment, retribution, and deterrence. Specifically, the Commonwealth submits that future notification requirements are unlikely to deter one from committing a sex crime. It notes that the underlying offenses which require Tier II and III registration are serious criminal offenses with long jail terms, and posits that the registration and notification requirements are not likely to achieve the objective of deterrence and retribution to nearly the same degree as the penalties and public opprobrium attendant to the commission of the underlying Tier II and III offenses. In any event, the Commonwealth suggests that this factor, even if promoting deterrence, should be given little weight in the overall punitive analysis.

Appellee argues that we should find that the registration and notification requirements have a significant deterrent effect given their prospective application and lifetime nature, which will logically serve as a deterrent, thus, weighing heavily in favor of finding them to be of a punitive nature.

In *LaCombe*, our Court found that SORNA's provisions promoted retribution. *LaCombe*, 234 A.3d at 624. As noted in that decision, however, Subchapter I's provisions were retroactive, and, thus, the deterrent effect was diminished because the registrant had already committed the criminal offenses. Nevertheless, our Court found this factor to weigh in favor of finding Subchapter I to be punitive, albeit giving it less weight. By contrast, Subchapter H is prospective in its application. While we question the strength of the deterrence effect of registration requirements compared to the criminal conviction and sentence for the underlying sex offense, nevertheless, we find Subchapter H promotes retribution and has a deterrence component. Thus, we conclude that this factor weighs in favor of finding Subchapter H to be punitive.

### Factor 6: Whether there is an alternative purpose to which Subchapter H may be rationally connected

The sixth factor considers whether there exists a nonpunitive alternative purpose to which the statute rationally may be connected. It is plain that Subchapter H was enacted to protect the public from sexual offenders, and, thus, was rationally connected to public health and safety. The trial court, however, analyzed whether there was a rational relationship between the registration and notification requirements and the public protection aspects of SORNA through a reduction in recidivism. Specifically, the court relied on the testimony of Dr. Letourneau and Professor Prescott who testified that registration and notification provisions do not reduce the rate of recidivism, but, to the contrary, because of stigma and diminished employment and housing prospects, hinder the offender's reintegration into society because they are branded as essentially irredeemable sex offenders. The trial court concluded that Appellees' experts had established that the reduction in recidivism and the public safety benefits the legislature claimed SORNA would provide were not rationally related to the purpose for which they were enacted.

The Commonwealth argues that, as the trial court found, the registration and notification provisions have a valid non-punitive purpose — protecting public safety. The Commonwealth rejects the trial court's conclusion that Subchapter H was not rationally related to its non-punitive purpose because the registry does not have the effect on recidivism anticipated by the legislature. The Commonwealth again stresses that the statute was not intended to impact recidivism; thus, it did not matter whether Appellees' experts demonstrated that recidivism rates of sexual offenders and non-sexual offenders are the same, as the goal of the statute was not reducing recidivism, but promoting public safety. As Appellee did not present any evidence that the statute did not protect the community in the manner designed, the Commonwealth maintains that this factor weighs in favor of finding the statute to be non-punitive.

Appellee, like the trial court, focuses upon whether the registry is rationally related to the intended goal of reducing recidivism. According to Appellee, his evidence, as credited by the trial court, established that SORNA did not have the effect on recidivism and public safety he envisions was intended by the General Assembly and, thus, was not rationally related to the purpose of reducing recidivism. As the law does not reduce recidivism, Appellee maintains that it constitutes punishment.

In *LaCombe*, we noted that the General Assembly declared that the purpose of Subchapter I was to protect public safety through registration and community access to information regarding sexually violent predators. We found that this purpose was based on the General Assembly's finding that "sexually violent predators and offenders pose a high risk of engaging in further offenses even after being released from incarceration or commitments, and protection of the public from this type of offender is a paramount government interest." *LaCombe*, 234 A.3d at 625 (citing 42 Pa.C.S. § 9799.51(a)(2)). We deferred to the General Assembly's findings in this regard, as we did in *Muniz*,

concluding that there was an alternative purpose other than punishment – informing and protecting the public regarding sexual offenders the General Assembly considers dangerous – weighing in favor of finding Subchapter I to be nonpunitive. *Id*.

Having found above that Appellee has not met his high burden of establishing that the presumption that sex offenders pose a high risk of reoffense is not true, and accepting that this presumption serves as the basis for the legislature's desire to protect the public from sexual offenders, as in *LaCombe*, we conclude that there is a purpose other than punishment to which Subchapter H is rationally connected: informing and protecting the citizenry regarding sexual offenders the legislature has found to pose a high risk of reoffense. Thus, we believe that this factor heavily weighs in favor of finding Subchapter H to be nonpunitive.

### Factor 7: Whether Subchapter H is excessive in relation to the alternative purpose

Having discerned an alternative statutory purpose — informing and protecting the public — we proceed to the final *Mendoza-Martinez* factor, which requires us to ascertain whether Subchapter H was nonetheless excessive in relation to the statute's non-criminal objective. In *Williams II*, in assessing Megan's Law II, our Court noted that, if the statute "is likely to result in individuals being deemed sexually violent predators who in fact do not pose the type of risk to the community that the General Assembly sought to guard against, then the Act's provisions could be demonstrated to be excessive." *Williams II*, 832 A.2d at 983.

The trial court concluded that the registration and notification requirements were excessive in relation to their proffered purpose. It noted that these requirements are based solely on the title of the offense, not the circumstances and personal characteristics of the offender. The court pointed to testimony from Dr. Hanson that the title of the offense bore no relationship to the question of whether the offender was likely to recidivate as the

seriousness of the offense did not correlate with a likelihood of recommission. The court asserted that Subchapter H did not "function as intended and is not effective at promoting public safety" and "diverts resources away from offenders who could most benefit from them." Trial Court Opinion, 8/22/22, at 27. The court also observed that Subchapter H encompasses crimes which have no sexual component to them.

The Commonwealth avers that Subchapter H is not excessively punitive in relationship to its protective purpose. Initially, the Commonwealth offers that this factor "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy;" rather, the inquiry is only to determine whether the regulatory means are "reasonable in light of [the legislature's] nonpunitive objective." *Smith v. Doe*, 538 U.S. 84, 105 (2003). In this regard, the Commonwealth stresses that the failure of the statute to require individualized assessment of a particular offender's propensity to reoffend does not render it excessively punitive, as the trial court concluded, given that it functions in the same manner as all statutes: it reflects a legislative policy determination that a particular group should abide by certain rules, and, in this case, the registration and notification rules sex offenders must abide by are reasonable. Here, the General Assembly organized its tier-based classification system around the perceived seriousness of the sexual offense which, in turn, is tied to the harm caused by the offense. While the trial court may disagree with this policy choice, the Commonwealth asserts that this does not make the statute unconstitutional. Furthermore, the Commonwealth rejects the trial court's assertion that Subchapter H is overbroad because it includes offenders who have committed crimes with no sexual component to them, explaining that simply because a crime does not contain a sex element does not mean it lacks a close association with sexual assault, such as kidnapping and child luring.

Appellee responds that the lifetime registration and notification requirements are excessive, as Subchapter H did not remove most non-sexual offenses from the registration requirements and still requires certain individuals whose offense involved no sexual component to register. Furthermore, Appellee offers his evidence that Subchapter H will require registration and notification of many individuals for life, even though statistically those individuals are unlikely to reoffend.

The General Assembly has created and maintained a tier-based classification system distinguishing classes based upon (1) the seriousness of the offense which, in turn, is based upon the harm caused by the sexual offense, and (2) the underlying presumption that sexual offenders pose a high risk of reoffense. A tier-based construct is a policy decision for the legislature, and it is based on a presumption — the high risk of a sex offender recidivism — that we have upheld. That being the case, the lack of an individualized assessment does not render Subchapter H's requirements excessive. Moreover, Appellee's emphasis on recidivism, or lack thereof, is misplaced, as the non-punitive purpose of the statute is informing and protecting the public. Concerning Appellee's contention that Subchapter H is too broad because it covers certain crimes without a direct sexual component, as in *LaCombe*, we are substantially aligned with the Commonwealth on this factor. As noted above, the General Assembly has removed certain qualifying offenses, lowered the registration periods for many offenses, and reduced in-person reporting requirements. As for the continued requirement of in-person visits, we find them to be a requisite for maintaining an accurate registry, which is necessary for public protection. Moreover, Subchapter H includes removal procedures for lifetime registrants, which the absence of in the prior version of SORNA had troubled our Court. *See LaCombe*, 234 A.3d 626. We believe that these provisions in Subchapter

H substantially diminish any charge of excessiveness and find that this factor weighs to a great degree in favor of finding Subchapter H to be nonpunitive.

## B. Balancing the Factors

All that remains for purposes of the *Mendoza-Martinez* analysis is the balancing of relevant factors. The trial court concluded that all of these factors uniformly weighed in favor of concluding that Subchapter H was punitive.

We initially note that the *Mendoza-Martinez* factors provide a "useful framework," and are "useful guideposts," but are "neither exhaustive nor dispositive." *Smith*, 538 U.S. at 97. That said, our Court has considered these factors, and their relative weight, in determining whether legislation constitutes criminal punishment. Of the five factors to which we assigned weight in this case, we find that two weighed in favor of finding Subchapter H to be punitive in effect, and three weighed in favor of finding the legislation to be nonpunitive, with the sixth and seventh factors being given the greatest weight.

In our view, weighing the *Mendoza-Martinez* factors does not compel the conclusion that Subchapter H is punitive. Here, the General Assembly created a tier-based classification system organized by seriousness of the offense, which, in turn, is tied to the degree of harm caused by the crime. This is a policy-based decision vested in the legislature. Like Subchapter I, we find that Subchapter H significantly changed the original version of SORNA with the apparent goal of ensuring that the legislation was not punitive in nature. Indeed, Subchapter H has a significantly less burdensome impact on the life of the offender than its predecessor. Moreover, we find compelling the Commonwealth's argument that not only does Subchapter H offer a valid non-punitive purpose of informing and protecting the public, but that Appellee failed to present compelling evidence establishing that its registration and notification requirements were excessive, *i.e.*, not rationally or reasonably related to this legislative purpose. As with

Appellee's irrebuttable presumption challenge, it was incumbent upon him to show that these requirements have no rational relationship to the stated goal of promoting community safety. Appellee produced evidence only of varying recidivism rates for sex offenses within the class of sex offenders, as a whole, and we find this is insufficient to show that the goal of community protection is not achieved, to some extent, by the registration and notification requirements. Thus, we conclude that Appellee did not meet his heavy burden, by the clearest of evidence, to rebut the General Assembly's stated non-punitive purpose. This being the case, we also conclude that, because a finding that Subchapter H constitutes criminal punishment is a threshold factor in determining the viability of Appellee's derivative constitutional challenges — that the legislation unconstitutionally usurps judicial power over sentencing in violation of the separation of powers doctrine, constitutes cruel and unusual punishment under the Eighth Amendment, and infringes upon the right to a trial by jury by failing to require that facts which increase the punishment imposed for the underlying crime be found by a reasonable doubt — these constitutional claims fail.[19]

---

[19] Regarding his claim that Subchapter H is violative of the Eighth Amendment's prohibition on cruel and unusual punishment, Appellee further contends that this claim persists even if we find Subchapter H to be non-punitive. Appellee's Brief at 97 ("The Commonwealth does not address this argument and fails to recognize that even if this Court agreed with it that Act 29 is not punitive under the *Mendoza-Martinez* framework, that doesn't resolve this issue."). However, in his brief, Appellee fails to explain in any meaningful fashion how a civil provision that is deemed to be non-punitive, which we have found today, may still serve as the basis for the finding of an Eighth Amendment violation. Rather, he posits only that "punishment" may include "all civil or criminal sanctions that serve retributive or deterrent purposes to any degree," citing our decision in *Shoul*. *Id.* (citing *Shoul*, 173 A.3d at 684). Indeed, the only cases that Appellee cites in favor of his position that Subchapter H constitutes cruel and unusual punishment both found their respective SORNA corollaries to be punitive under the *Mendoza-Martinez* factors. *See People In the Interest of T.B.*, 489 P.3d 752 (Colo. 2021) (finding Colorado's CSORA legislation imposing lifetime registration on juvenile sex offenders to constitute punishment under *Mendoza-Martinez* factors, then proceeding to conclude statute constituted cruel and unusual punishment under Eighth Amendment); *People v. Lymon*, (continued…)

## VII. Conclusion

We hold that Appellee failed to meet his burden to establish that Subchapter H's irrebuttable presumption, that sex offenders pose a high risk of reoffense, is constitutionally infirm. Furthermore, we conclude that Appellee failed to meet his burden in demonstrating that Subchapter H constitutes criminal punishment. Accordingly, we reject his subsidiary constitutional challenges. Thus, for the above stated reasons, we reverse the Chester County Court of Common Pleas' order finding Subchapter H unconstitutional and relieving Appellee of his duty to comply with Subchapter H.[20]

Jurisdiction relinquished.

Justices Dougherty, Mundy and Brobson join the opinion.

Justice Mundy files a concurring opinion.

Justice Wecht files a concurring and dissenting opinion.

Justice Donohue files a dissenting opinion.

---

993 N.W.2d 24 (Mich. Ct. App. 2022) (determining that Michigan's SORA statute constituted punishment under the *Mendoza-Martinez* factors, and that it also constituted cruel and unusual punishment under the Michigan and federal Constitutions), *appeal granted*, 983 N.W.2d 82 (Mich. 2023). Thus, we reject Appellee's underdeveloped argument in this regard.

[20] Appellee's "Application for Leave to File a Post-Submission Communication" forwarding for the Court's information a recent decision by the Supreme Court of Montana is granted.